[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11124

_____

LISA HILL LEONARD,
An individual,
LEONARD DRUGS INC,
An Alabama Corporation d.b.a. The Drug Store,

                                  Plaintiffs-Appellants,

*versus*

THE ALABAMA STATE BOARD OF PHARMACY,
A State Licensing Board,
BRENDA DENSON,
CHRIS PHUNG,
ROBERT COLBURN,
CHRISTY K. GARMON,
GARY MOUNT,
Individually and in their official capacities as Members

2                    Opinion of the Court                    22-11124

of the Alabama State Board of Pharmacy,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 3:21-cv-00596-ECM-SMD

_____

Before WILSON, JILL PRYOR, Circuit Judges, and RUIZ,* District
Judge.

WILSON, Circuit Judge:

    In the early days of the Covid-19 pandemic, both State and
Federal governments partnered with private citizens and busi-
nesses to "Stop the Spread" of the virus.  The government invested
billions of dollars in the research, development, and production of
tests to detect existing infections and vaccines to arrest the preva-
lence of future infections.  Thousands of businesses, schools, hos-
pitals, and community organizations across the nation mobilized
to distribute tests and vaccines to millions of people.  To encourage
voluntary      participation      in     the     distribution     of     these

_____

*Honorable Rodolfo A. Ruiz II, United States District Judge for the Southern
District of Florida, sitting by designation.

countermeasures, the Secretary of Health and Human Services (HHS) invoked the Public Readiness and Emergency Preparedness Act (PREP Act), to provide legal immunity for the individuals and organizations who provided these countermeasures to the public.

Based in Auburn, Alabama, Lisa Leonard and her pharmacy were one of the thousands of businesses who answered the call to provide Covid-19 tests to the public. However, the Alabama Board of Pharmacy (the Board) concluded that Leonard's administration of these tests fell short of the medical safety standards required under Alabama law. When the Board instituted an administrative enforcement proceeding against Leonard, she sought to avail herself of the legal immunity provided by the Secretary's PREP Act Declaration. Leonard filed this federal suit, seeking to enjoin the Board from even considering the charges against her. The district court exercised its discretion to abstain under *Younger v. Harris*, 401 U.S. 37 (1971) and declined to intervene in the Board's proceedings. This appeal followed.

After careful review of the record, and with the benefit of oral argument, we affirm the district court's decision to abstain under *Younger*. Leonard and her business have an adequate opportunity to raise their federal immunity argument before the Board, and none of the exceptions to *Younger* abstention apply in this case.

## I.    Background

*A.*

On January 31, 2020, the Secretary of HHS declared a public health emergency in the United States following the outbreak of the Covid-19 pandemic.  Two months later, on March 17, 2020, the Secretary issued a declaration pursuant to the PREP Act in order "to provide liability immunity for activities related to medical countermeasures against COVID-19."  Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15,198 (Mar. 17, 2020) (the Declaration).

Under the Declaration, "covered persons" receive PREP Act immunity for administering "covered countermeasures."  Covered countermeasures include "any diagnostic [test] . . . used to treat, diagnose, cure, prevent, or mitigate COVID-19."  *Id.* at 15,202.  On April 8, 2020, HHS issued guidance advising that pharmacists were covered persons for purposes of the Declaration and thus entitled to PREP Act immunity.  U.S. Dep't of Health and Hum. Servs., *Guidance for Licensed Pharmacists, COVID-19 Testing, and Immunity under the PREP Act* (Apr. 8, 2020) [hereinafter, Pharmacist Guidance],        https://www.phe.gov/Preparedness/legal/prepact/Documents/pharmacist-guidance-COVID19-PREP-Act.pdf.

*B.*

Lisa Leonard and her husband, Craig, are licensed pharmacists in Auburn, Alabama.  Together they owned and operated

"The Drug Store" pharmacy. The Drug Store began administering antibody tests at the end of April 2020, and between April and September of 2020 it administered more than 5,900.

Leonard's trouble with the Board began during the summer of 2020. Board investigator Sean Malloy first visited The Drug Store on June 14, 2020, to address alleged customer privacy complaints. Later, on July 27, 2020, Chuck Beams, a competing pharmacist at a local hospital, contacted the Board with concerns about testing practices at The Drug Store. Malloy began corresponding with Beams about his complaint and, at Malloy's request, Beams provided a written statement to Malloy on July 29. Later, after Beams requested an update on his complaint, Malloy responded on August 7, 2020, stating that they would be meeting with Leonard soon and "[i]f all goes the way we plan then I believe we will stop any further issues from The Drug Store."

Meanwhile, investigator Glenn Wells called Leonard to discuss Beams's complaint. This was not the first time that Wells and Leonard had crossed paths. In 2005, Leonard accused Wells of brandishing a gun at her, though Wells denies this. On August 26, 2020, Malloy and Wells visited The Drug Store in person and spoke with Leonard about the administration of antibody tests at the pharmacy. A month later, a third investigator named Mark Delk visited the pharmacy. He requested that Leonard and her husband provide a written statement about the 2005 incident with Wells.

Following these interactions, Leonard and her pharmacy voluntarily stopped providing antibody tests without any Board

action.  Nearly seven months later, the Board filed a Statement of Charges against Leonard and The Drug Store.  The charges alleged that the way the pharmacy administered the antibody tests violated Alabama's pharmacy regulations and the Board's ethics rules. Among other things, the Charges alleged that the pharmacy misrepresented the nature of the antibody tests to its customers, failed to safely dispose of lancets[1] used to administer the tests, and used alcohol swabs improperly when administering the tests.

Leonard filed this suit in the Middle District of Alabama. Her complaint, as amended, alleged that the Board's charges were violations of antitrust laws, *ultra vires*, preempted, and unconstitutional.  Leonard requested a preliminary injunction to restrain the Board from proceeding on its Statement of Charges.  In particular, Leonard argued that the PREP Act's "Targeted [L]iability [P]rotections," 42 U.S.C. § 247d-6d, immunized her.  The Board moved to dismiss the complaint for failure to state a claim, and the district court agreed as to all but the PREP Act claims.  Regarding these, the district court abstained from federal jurisdiction pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), and did not reach the merits. Leonard timely appealed the abstention decision.

---

[1] A lancet is a small, sharp, spring-loaded device that takes small blood samples.

## II.    Standard of Review

We review a district court's decision to abstain for abuse of discretion, but it is always an abuse of discretion for a court to apply an incorrect legal standard. *Hughes v. Att'y Gen. of Fla.*, 377 F.3d 1258, 1262 (11th Cir. 2004). Further, "only the clearest of justifications merits abstention," and where *Younger*'s prerequisites are not satisfied, federal courts must exercise their jurisdiction. *Tokyo Gwinnett, LLC v. Gwinnett Cnty.*, 940 F.3d 1254, 1266–67 (11th Cir. 2019) (quotation marks omitted and alteration adopted) (quoting *Jackson-Platts v. Gen. Elec. Capital Corp.*, 727 F.3d 1127, 1140 (11th Cir. 2020)). However, when the prerequisites are met, "federal courts may *and should* withhold equitable relief to avoid interference with state proceedings." *31 Foster Child. v. Bush*, 329 F.3d 1255, 1274 (11th Cir. 2003) (emphasis added).

## III.    Principles of Abstention

While the federal courts have a "virtually unflagging" obligation to hear the cases before them, the *Younger* doctrine presents a narrow exception. *Id.* (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). *Younger* "requires a federal court to abstain where a plaintiff's federal claims could be adjudicated in a pending state judicial proceeding." *Deakins v. Monaghan*, 484 U.S. 193, 202 (1988). This reflects the norms of comity and respect inherent in "Our Federalism." *Younger*, 401 U.S. at 44. But "Our Federalism" does not require "blind deference to 'States' Rights,'" *id.*, and not every state judicial proceeding requires federal abstention. The Supreme Court has recognized only

three types of state proceedings where abstention is warranted: (1) "criminal prosecutions"; (2) "civil enforcement proceedings"; and (3) "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' . . . judicial functions." *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 367–68 (1989) (*NOPSI*) (declining to extend *Younger* to state judicial review of legislative or ratemaking actions).

When a federal lawsuit overlaps with one of these types of state proceedings, and the federal court is asked to interfere in the state proceeding, the federal court must consider whether the three factors enumerated in *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 432 (1982), are present: First, is the state proceeding "ongoing" at the same time as the federal one? Second, does the state proceeding implicate an "important state interest"? And third, does the state proceeding provide an "adequate opportunity" to raise the federal claim? *Tokyo Gwinnett*, 940 F.3d at 1268 (citing *Middlesex*, 457 U.S. at 432).

When these three *Middlesex* factors are met, *Younger* abstention is warranted, and the federal court should abstain and allow the state proceeding to go forward. But, *Younger* recognized that in certain "extraordinary circumstances" a federal court should refuse to abstain even if the other factors warrant it. *Younger*, 401 U.S. at 45. We have summarized these circumstances, recognizing that a federal court should refuse to abstain if: "(1) there is evidence [the] state proceedings [are] motivated by bad faith, (2) irreparable injury would occur, or (3) there is no adequate alternative state

forum where the constitutional issues can be raised." *Hughes*, 377 F.3d at 1263 n.6 (citing *Younger*, 401 U.S. at 45, 53–54).[2]

## IV.    *Middlesex* Factors

The parties agree that the Board's proceeding is a "civil enforcement action" to which *Younger* applies,  that it was both "ongoing" when the federal suit was filed, and that Alabama has an "important state interest" in enforcing its pharmacy regulations. Thus, we train our attention on the third *Middlesex* factor: whether the Board's proceedings provide Leonard an "adequate opportunity" to assert her PREP Act claims.  We conclude they do.

The burden is on the plaintiff to show that the state forum is not adequate to adjudicate their federal defenses.  *31 Foster Child.*, 329 F.3d at 1279.  Further, when the plaintiff "has not attempted to present [their] federal claims in related state-court proceedings, a federal court should assume" that the state proceedings

_____

[2] The third *Hughes* exception tracks the third *Middlesex* factor: whether the state forum is adequate to hear the plaintiff's federal claim.  Our caselaw has been ambiguous on whether to treat this consideration as an exception to *Younger*, or as a precondition to it.  *Compare Hughes*, 377 F.3d at 1263 n.6, *with Butler v. Ala. Jud. Inquiry Comm'n*, 245 F.3d 1257, 1262 (11th Cir. 2001) (noting "*Middlesex* sets out three benchmarks" and "the parties do not dispute[] that the first two *elements* are satisfied here" (emphasis added)).  Whatever tension there is in our caselaw, it is only a tension over labeling, as we apply the same legal standards in both lines of cases.  In this case, the parties and the district court discussed this factor in the context of *Middlesex*, and as a precondition to *Younger*, so we do the same.

are adequate, except upon "unambiguous authority to the contrary." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15 (1987).

Adequacy in this context is not about the quality of the state proceedings, but rather about "whether th[e] challenge *can be raised* in the pending state proceedings" at all. *Moore v. Sims*, 442 U.S. 415, 425 (1979) (emphasis added). In *Moore*, the State of Texas had instituted lawsuits to terminate the parental rights of the plaintiffs, but the plaintiffs sued in federal court to halt the state proceedings, arguing the Texas laws were unconstitutional. *Id.* at 419–22. The district court refused to abstain, concluding that the plaintiffs' constitutional challenge was "multifaceted" and that there was no singular, convenient state forum for them to assert their constitutional challenge. *Id.* at 424. The Supreme Court reversed, concluding that even though the litigation was complicated, nothing procedurally stopped the plaintiffs from asserting their constitutional challenge. *Id.* at 425–26. The Court noted Texas's permissive rules of joinder in parental rights proceedings and that Texas courts were empowered by statute to hear all claims properly joined. *Id.* at 425 & n.9.

Simply put, generalized arguments about the inadequacy, inconvenience, or complexity of proceedings before a state tribunal will not do. *See id.* at 425–27. "Instead, what matters is whether the plaintiff is *procedurally* prevented from raising his constitutional claims in the state courts, from which a certiorari petition can be filed seeking review on the merits in the United States Supreme Court." *Pompey v. Broward Cnty.*, 95 F.3d 1543, 1551 (11th

Cir. 1996) (citing *Moore*, 442 U.S. at 432).  To demonstrate that claims are procedurally prevented in state tribunals, plaintiffs should provide evidence of state laws, rules, or procedures that would allow a district court to evaluate whether the plaintiff's federal claims will effectively be shut out from the judicial system and cut off from effective review in the courts.

Further, in the administrative law context, the Supreme Court has held that "it is sufficient under *Middlesex* that constitutional claims may be raised in state-court judicial review of the administrative proceeding."  *Ohio Civ. Rts. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 629 (1986) (internal citation omitted).

Here, Leonard's claims of federal preemption and immunity can be raised both before the Board itself and in Alabama state court.  Board of Pharmacy proceedings are governed both according to the requirements of the Board's organic act, Ala. Code. § 34-23-1 *et seq.*, and provisions of the Alabama Administrative Procedure Act (AAPA) made applicable to Board proceedings.  Ala. Code. §§ 34-23-92(12), 34-23-94.  When the Board seeks to revoke a pharmacist's license, it must serve upon the respondent a statement of charges and notice of hearing.  Ala. Code §§ 34-23-34, 41-22-12.  After that, the AAPA contemplates that other pleadings and motions may be filed in advance of the hearing.  *See, e.g.*, Ala. Code § 41-22-12(c) ("[O]n motion of a party, the presiding officer . . . may issue . . . discovery orders related to relevant matters . . . in accordance with the rules of civil procedure."); *id.* § 41-22-12(g) ("The

record in a contested case shall include: (1) All pleadings, motions, and intermediate rulings . . . .").  In fact, the record reveals that Leonard availed herself of these procedures.  She filed answers to the Board's original and amended Statements of Charges, and the parties have requested and received continuances of the Board's hearing while this case is pending in federal court.  In her answers to the Statements of Charges, Leonard has asserted and raised not only her federal preemption and immunity defenses, but also other defenses grounded in the United States Constitution or federal statutes.  The fact that Leonard has been able to assert her federal defenses in the Board's proceedings all but dooms Leonard's adequacy argument.  *Middlesex*, 457 U.S. at 437 & n.16 (noting that "[i]t would trivialize the principles of comity and federalism" to ignore that the state courts had in fact entertained the plaintiff's federal claims).  But in addition, our review of Alabama's administrative code and the Board's organic act confirms that, just like in *Moore*, there is nothing procedurally stopping Leonard from having her federal defenses considered in the Board's proceedings.

Moreover, if Leonard does not prevail on her federal defenses before the Board, or even if the Board sidesteps ruling on Leonard's federal claims altogether, she can still seek judicial review in the Alabama state courts.  *See* Ala. Code § 41-22-20(a)–(b) (providing any "person who has exhausted all administrative remedies available" and is still "aggrieved by a final decision in a contested case" may seek review in an Alabama circuit court); *id.* § 41-22-21 (providing for appeals from circuit courts' review of

administrative proceedings to appropriate Alabama courts of appeals). These reviewing courts would review any legal conclusions embedded in the Board's decision de novo. *See Ex parte Wilbanks Health Care Servs., Inc.*, 986 So. 2d 422, 425 (Ala. 2007) ("Review of the hearing officer's conclusions of law . . . is *de novo.*"); *see also* Ala. Code § 41-22-20(k)(1) ("The court may reverse or modify . . . the agency action . . . if substantial rights of the petitioner have been prejudiced because the agency action is . . . (1) [i]n violation of constitutional or statutory provisions."). If Leonard is not satisfied with the review provided by the Alabama courts, she can ultimately petition for review of her federal challenges in the United States Supreme Court. *See* 28 U.S.C. § 1257. Therefore, not only has Leonard been able to present her federal defenses in the administrative proceeding, but Alabama law also provides that her constitutional claims may be raised in Alabama's courts consistent with *Ohio Civil Rights Commission*. *See* 477 U.S. at 629. Leonard has simply not carried her heavy burden under our precedents to show that the state forum is inadequate. *See 31 Foster Child.*, 329 F.3d at 1279.

Leonard also argues that, even if she could get an adjudication *at some point*, that it would be too late to adequately vindicate her rights. The PREP Act provides immunity for providers of covered countermeasures "from suit and liability" related to the administration of those countermeasures. 42 U.S.C. § 247d-6d(a)(1). Leonard claims her immunity "from suit" will be violated if she is forced to participate in the hearing or to seek state appellate review

on the back end of those proceedings. She analogizes this situation to the world of qualified immunity jurisprudence, which generally allows state governmental officials to immediately take an interlocutory appeal of a denial of qualified immunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("[A]n *immunity from suit* . . . is effectively lost if a case is erroneously permitted to go to trial."). But this argument fails because the AAPA does provide for interlocutory review of preliminary administrative rulings: "A preliminary, procedural, or intermediate agency action or ruling is immediately reviewable if review of the final agency decision would not provide an adequate remedy." Ala. Code § 41-22-20(a). The AAPA and the Board's hearing procedures thus provide exactly what Leonard seeks: she may move the hearing officer to dismiss the Statement of Charges, and if denied, she may seek judicial review of that denial in Alabama state court. Because Leonard has not attempted to avail herself of this procedural avenue, she bears the even heavier burden of providing "unambiguous authority" that this procedure is inadequate. *Pennzoil*, 481 U.S. at 15. She has not done so in this case, and so we hold that Alabama's administrative and judicial system is adequate under *Middlesex* to adjudicate her claims of PREP Act immunity and preemption.

## V.    *Younger* Exceptions

Because all three *Middlesex* factors are satisfied, *Younger* abstention is warranted unless Leonard can show that one of the exceptions applies. *Younger*'s progeny have crystalized these exceptions into two broad categories: proceedings instituted in "bad

faith" and proceedings founded on "flagrantly and patently" unconstitutional laws. We address each in turn.

### A.  Bad-Faith Exception

In *Kugler v. Helfant*, 421 U.S. 117 (1975), the Supreme Court held that bad faith "in this context generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction." *Id.* at 126 n.6. We applied this standard in *Redner v. Citrus County*, 919 F.2d 646 (11th Cir. 1990). There, the plaintiff argued that he was being targeted in bad faith by the county because it passed an ordinance outlawing adult stores the day before he opened his own adult store business. *Id.* at 650 n.8. We held this was insufficient to show bad faith because whether or not the ordinance had a targeted scope did not bear on the question of whether the prosecution had a "reasonable expectation" of success. *See id.* at 650 & n.8 (quoting *Kugler*, 421 U.S. at 126 n.6).

Leonard argues that a pair of old Fifth Circuit cases show that the bad-faith exception applies even when there is a "reasonable expectation" of success *if* the charges were instituted for the purpose of harassment. *See Wilson v. Thompson*, 593 F.2d 1375, 1387 (5th Cir. 1979); *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir. Jan. 1981) (per curiam).[3]  Our predecessor court did once remark, "[n]or is it necessary for [a] plaintiff to prove that the prosecution

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

could not possibly result in a valid conviction." *Fitzgerald*, 636 F.2d at 945. But it made this statement in the context of retaliation against core constitutionally protected rights. *See id.* (requiring the plaintiff to show "that the conduct allegedly retaliated against . . . is constitutionally protected and that the state's [charges are] motivated at least in part by a purpose to retaliate against or deter that conduct"); *Wilson*, 593 F.2d at 1383 (concluding abstention is not warranted if the state charges were "brought in bad faith for the purpose of retaliating for or deterring the exercise of constitutionally protected rights").

In *Fitzgerald*, the plaintiffs made critical comments about local public officials, and local judges exerted pressure on the district attorney to bring charges in retaliation for these comments. 636 F.2d at 944–45. In *Wilson*, criminal charges against the plaintiffs were revived after the local authorities learned the plaintiffs had filed a civil suit against two local sheriff's deputies. 593 F.2d at 1377–79. In both cases, the plaintiffs showed that the charges were brought in retaliation against the exercise of their protected First Amendment Rights. What is more, requiring that harassment be targeted at a constitutional right is consistent with the practice of our sister circuits. *See, e.g.*, *Phelps v. Hamilton*, 59 F.3d 1058, 1064–65, 1064 n.12 (10th Cir. 1995) (collecting cases and distinguishing between those bad-faith prosecutions that lack "probable cause" and ones brought to "chill[]" the exercise of constitutional rights); *Lewellen v. Raff*, 843 F.2d 1103, 1109–10 (8th Cir. 1988) (similar); *Cullen v. Fliegner*, 18 F.3d 96, 103–04 (2d Cir. 1994)

(affirming non-abstention based on district court's finding that state's proceedings "'imposed a chilling effect' on Appellee's First Amendment rights").

Here, Leonard's failure to identify constitutionally protected conduct that is being retaliated against forecloses her harassment argument. Our precedents distinguish between cases where charges are brought to target protected conduct and those where "the only constitutional issue at stake is the validity of the challenged state [charges]." *Wilson*, 593 F.2d at 1382–83 (quotation marks omitted) (citation omitted). Leonard's case falls neatly into the latter category.

\*    \*    \*

Because Leonard cannot show harassment in response to the exercise of her constitutional rights, she must instead show that the charges were "brought without a reasonable expectation of obtaining a valid conviction" in order to invoke the bad-faith exception. *Redner*, 919 F.2d at 650 (quoting *Kugler*, 421 U.S. at 126 n.6). However, none of the facts to which Leonard points make this showing. As an initial matter, Leonard has not provided any substantial allegation that the Board itself, or its individual members, are acting in bad faith. Leonard instead focuses on the alleged bad faith of the Board's investigators: Malloy, Delk, and Wells. The Board argues that any bad faith attributable to its investigators should not be automatically imputed to the Board without some evidence that the Board adopted that bad faith. We need not decide whose intent matters, though, because even focusing solely on

the investigators' intent, Leonard has still not carried her burden under *Redner*.[4]

Turning to the investigators' alleged bad faith, Leonard points to three sets of facts in an attempt to carry her burden. First, she alleges that investigator Malloy's territory did not include The Drug Store. Even if true, we cannot see how this bears on the question of whether the charges were instituted without a reasonable expectation of success.

Second, she points to the anti-competitive motives of Chuck Beams (a competing pharmacist) and his interactions with Malloy. However, the motives of Beams in isolation are irrelevant to the bad-faith analysis, as he had no involvement in the charging process. His allegedly bad-faith motives are only relevant to the extent that they were adopted by the Board's investigators. Leonard points to the emails exchanged between Malloy and Beams, but fails to provide more than a conclusory explanation how these emails would show bad faith. After reviewing the record in context, these emails on their face evince just benign professional

---

[4] To be clear, there is good reason to doubt that Leonard could in fact show that the Board's decisionmaking was infected with any of the alleged bad faith of its investigators. The record evidence demonstrates that the Board's members are insulated from their staff until the hearing date so that they can be impartial adjudicators of the charges. In addition, the record shows that the investigators' findings are further filtered through the Board's staff counsel and Executive Secretary, who act as another impartial layer between the investigators and the Board members.

courtesy. Malloy requested that Beams make a statement in writing about his complaint, and after he did, Malloy thanked him for sending it. Later, Malloy responded to Beams's request for an update on his complaint, and Malloy let him know the investigation would probably be ending soon. Even if these emails were construed in a more sinister fashion, they still do not show whether the Board had a reasonable expectation of success in bringing its charges.

Finally, Leonard alleges that the mere involvement of investigator Wells shows bad faith. Again, Leonard has not suggested what inference we should draw from the simple fact of his involvement. Her argument appears to be that, because Leonard accused Wells of drawing a gun on her in 2005, he was biased in his present-day interactions with Leonard and her staff. But this too has no bearing on the showing required under *Redner*. Whether Wells had a personal animosity towards Leonard says next to nothing about whether the Board's charges were instituted without a reasonable expectation of success.

Leonard has alleged facts that, when drawn in her favor, might suggest that the investigators were personally hostile to her and her business. But, like in *Redner*, being the target of the Board's investigators is not itself evidence of bad faith, and Leonard has not shown any evidence that because of this hostility the Board's charges were baseless. Because Leonard has not carried her burden under either the "reasonable expectation" standard or

the harassment standard, the bad-faith exception to *Younger* does not apply.

### B. *Flagrantly Unconstitutional Laws Exception*

A prosecution founded on "flagrantly and patently" unconstitutional laws would also constitute the sort of "extraordinary circumstance" justifying federal intervention in state proceedings. *Younger*, 401 U.S. at 53. The Supreme Court suggested in *NOPSI* that this exception might be satisfied if there was a "facially conclusive" claim of preemption. *See NOPSI*, 491 U.S. at 367.

We previously considered the scope of the "facially conclusive" form of this exception in *Hughes v. Attorney General of Florida*, 377 F.3d 1258 (11th Cir. 2004). There, we noted the narrowness of the exception and held that "only the clearest of federal preemption claims" would justify a federal court interfering in a case pending before an otherwise adequate state tribunal. *Id.* at 1265 & n.10; *see also Younger*, 401 U.S. at 53–54 (suggesting the exception applies in the narrow instance where state laws are unconstitutional "in every clause, sentence and paragraph, and in whatever manner and against whomever" they are applied (quoting *Watson v. Buck*, 313 U.S. 387, 402 (1941))). In *Hughes*, the plaintiffs were being prosecuted under Florida law for operating an aircraft while intoxicated. 377 F.3d at 1260–61. We reversed the grant of a writ of habeas corpus halting the prosecutions, because it was not "absolutely clear" that the state laws were preempted by the federal aviation laws. *Id.* at 1261, 1271–72; *see also id.* at 1273–74 (reasoning that unresolved tensions between competing parts of

the regulatory scheme meant that preemption was not facially conclusive).

While the parties extensively briefed the issue, we need not decide the total scope of PREP Act preemption today. Because the *Middlesex* factors are satisfied, and *Younger* abstention is warranted in this case, our only question is whether this case is one of the "clearest" cases of preemption, justifying non-abstention in spite of the *Middlesex* factors. *Hughes*, 377 F.3d at 1265. After applying the principles of preemption, we conclude Leonard's claim is not "facially conclusive."

### 1. Principles of Preemption

Federal preemption of state law flows from the Supremacy Clause of the United States Constitution. U.S. Const. art. VI, cl. 2. Under our system of federalism, there is a presumption against construing statutes to preempt the "historic police powers" of the states to regulate for the health and safety of their citizens, unless it is the "manifest purpose of Congress" to do so. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). So, when we evaluate the scope of federal preemption, "the purpose of Congress is the ultimate touchstone." *Id.* (alteration adopted) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978)). Congress's purpose may be stated explicitly, or it may be implicit in the structure and substance of the statute. *Id.* When it is explicit in the text of the statute, our "task is one of statutory interpretation." *See id.* at 532 (Blackmun, J., concurring in part); *see also id.* at 517 (majority

opinion) (applying the traditional statutory canon of *expressio unius* to interpret the express preemption provision). In situations where Congress has not spoken explicitly, preemption may still occur through Congress's enactment of laws that actually conflict with state laws "or where the scheme of federal regulation is sufficiently comprehensive" to suggest that Congress intended to occupy the field of regulation to the exclusion of the States. *Lawson-Ross v. Great Lakes Higher Educ. Corp.*, 955 F.3d 908, 916 (11th Cir. 2020) (internal quotation marks omitted).

2. PREP Act Preemption

Here, the PREP Act contains an express preemption clause, it reads:

**(8) Preemption of State law**

During the effective period of a declaration under subsection (b), or at any time with respect to conduct undertaken in accordance with such declaration, no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that—

(A) is different from, or is in conflict with, any requirement applicable under this section; and

(B) relates to the [creation, use, administration, etc. of covered countermeasures]

42 U.S.C. § 247d-6d(b)(8).

Here, the Declaration and its guidance documents provide that Covid-19 antibody tests are covered countermeasures and that pharmacists are covered persons.  Declaration, *supra*, 85 Fed. Reg. at 15,202; Pharmacist Guidance, *supra*.  Thus, the relevant preemption question here is whether the Board's charges are "different from" or "in conflict with" the PREP Act and the Declaration.

Because the PREP Act has an express preemption provision, we begin with the text.  *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484–85 (1996).  The PREP Act only preempts state laws that conflict with "requirements" of the PREP Act or the Declaration.  Leonard argues that the PREP Act's immunity from "suit and liability . . . for a claim for loss" is a requirement under the Act, and the Board's charges seeking to impose liability are in conflict with it.  But the Board notes that its charges are not "claims for loss."  In fact, as the Board notes, there is no loss—these are administrative enforcement charges only.  While Leonard argues that the "loss" in this case is the loss of her license if the Board is successful, this reading stretches the text too far.  The more natural reading of the statute is that covered persons are immunized from suits by plaintiffs trying to recover for the *plaintiffs'* losses caused by covered persons, not suits by those seeking to impose a loss *on* the covered person.

However, because Congress's purpose is the "touchstone" of our analysis, we must place this text in the context of the whole statute.  Leonard argues that even if the Board's charges are administrative, the statutory authority under which the charges are brought speaks in the language of tort law.  *See, e.g.*, Ala. Code

§ 34-23-33(a)(6) (providing that the Board may revoke a pharma-cist's license for "gross malpractice" and "gross negligence").  She correctly notes that the few cases to have addressed PREP Act preemption have generally concluded that state tort law is preempted with respect to the administration of covered counter-measures.  *See, e.g.*, *Parker v. St. Lawrence Cnty. Pub. Health Dep't*, 954 N.Y.S. 2d 259 (N.Y. App. Div. 2012).  Further, the text of the PREP Act provides guidance on Congress's purpose: PREP Act declarations are issued to "encourag[e]" the administration of cov-ered countermeasures.  42 U.S.C. § 247d-6d(b)(6) (describing the factors to be considered).  With this in mind, we understand Leon-ard's argument that it would seem odd for Congress to immunize covered persons from private suits for damages, while still subject-ing them to government administrative actions seeking to revoke their licenses for the same conduct.

With the text of the statute pulling in one direction and Con-gress's purpose arguably pulling in the other, "it is not absolutely clear to us, i.e., facially conclusive" that we should resolve this ten-sion in favor of finding preemption.  *See Hughes*, 377 F.3d at 1271.  Leonard's claim is not one of "the clearest of federal preemption claims" that would justify federal intervention in spite of the *Mid-dlesex* factors being satisfied.  *See id.* at 1265.  Nor can we see from the face of the Board's charges that they are "flagrantly and patently violative of express constitutional prohibitions in every clause, sen-tence and paragraph, and in whatever manner" as applied against Leonard.  *Younger*, 401 U.S. at 53–54 (quoting *Watson*, 313 U.S. at

402).  Therefore, we conclude that this exception is also not applicable to Leonard's case.

## VI.    Conclusion

Our holding today is a limited one.  We conclude that Leonard has not established that she lacks an adequate opportunity to present her federal claims to the Alabama Board of Pharmacy or an adequate opportunity to obtain judicial review of her claims in Alabama's courts, and so *Younger* abstention is warranted.  We do not decide today whether Leonard is immune from the Board's charges or if they are in fact preempted by the PREP Act.  All we conclude is that this is not one of the "extraordinary circumstances" that would justify federal intervention in a state proceeding that is adequate to hear Leonard's claims.  Accordingly, the district court did not abuse its discretion and is due to be affirmed.

**AFFIRMED.**